# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**United States of America**

    *Plaintiff*,

**v.**               **Case No. 3:20-cr-102**
                  **Judge Thomas M. Rose**

**Stephon Michael Jones & Kalani Raimar Grier,**

    *Defendants*.

---

## ENTRY AND ORDER DENYING DEFENDANT STEPHON MICHAEL JONES'S MOTION TO SUPPRESS EVIDENCE (Doc. 46) AND DENYING DEFENDANT KALANI RAIMAR GRIER'S MOTION TO SUPPRESS EVIDENCE. (Doc. 47)

---

Pending before the Court are motions to suppress filed by Defendant Stephon Michael Jones, (Doc. 46) and Defendant Kalani Raimar Grier. (Doc. 47). Jones seeks suppression of an interview conducted while he was hospitalized, as well as evidence gathered as a result of that interview. Grier seeks suppression of statements made during an in-custody interview.

**Background**

Between 8:00 - 8:30 PM on October 23, 2019, officers from the Dayton Police Department responded to a 911 call that reported a shooting near 1207 Windsor Ave. (Doc. 58, PageID 150, 152, 169; Tr. at 5, 7, 24). Upon arriving on scene, police officers observed a victim lying in the middle of the street in a pool of blood. (Tr. at 8; Govt. Ex. 5, p.7). The victim, who suffered a

1

gunshot wound to his face was later identified as Stefon Hunter. (Tr. at 8, 25, 35; Govt. Ex. 5, p. 7-9). Hunter was transported from the crime scene to the Miami Valley Hospital where he later expired. (Tr. at 11).

Police officers proceeded to interview three on-scene witnesses: "E.C.-G.", "E.P." and "C.C." (Tr. at 8, 24-25; Govt. Ex. 6). These witnesses provided conflicting, incomplete and otherwise confusing accounts of the shooting. (Govt. Ex. 5, p. 7, 9). "E.C.-G." was unable to provide any significant details about the incident because he purportedly was then too distraught to speak about the event. (Tr. at 8; Govt. Ex. 5, p. 7-8). "E.P." indicated she was a friend of Hunter, however, was not physically close enough to him when the shots went off to provide any details. (Tr. at 10-11). "C.C." advised that both he and Hunter had been walking down the street when an older tan model SUV pulled up alongside them and opened fire. (Govt. Ex. 5, p. 7). "C.C." provided no explanation as to why the vehicle occupants fired at them. (Id.).

The officers discovered a single spent .22 caliber shell casing and a single spent .380 shell casing near where Hunter's body was found. (Tr. at 8; Govt. Ex. 5, p. 10). A short time afterwards, dispatch advised on-scene officers that a tan GMC Envoy SUV matching the description provided by "C.C." had just arrived at the Grandview Hospital Emergency Room. (Tr. at 5, 9, 57, 59; Govt. Ex. 5, p.8). Officers and detectives traveled to the hospital to investigate. (Tr. at 9, 25).

The police learned four individuals occupied the subject vehicle when it arrived at the hospital. (Tr. at 9-10). The vehicle displayed a broken window and visible bullet holes. (Tr. at 5, 9, 57, 59; Govt. Ex. 5, p.8). Only two of the occupants, who later turned out to be Defendant Stephon Michael Jones and Kalani Raimar Grier, had suffered gunshot wounds. (Tr. at 5, 10-11).

Jones had a gunshot wound that shattered his left femur, while Grier suffered a superficial graze wound across his chest. (Tr. at 12, 19, 30-31, 43; Def. Ex. A).

In hopes of learning more about the shooting, Police Department Homicide Detective William Geiger and Sergeant Walt Steele from the Montgomery County Sheriff's Office decided to interview Jones, who was then located in Emergency Room 28. (Tr. at 10-12, 25-27, 32, 64-65, 67; Def. Ex. A, p. 287). Upon their arrival at the hospital, they observed the SUV with bullet holes.

When Jones was admitted to the hospital, Dr. Stephen Paul determined, "Due to the circumstances surrounding his trauma, we will make him Do Not Announce. He should have an officer with him at all times." Doc. 61-1, PageID 244. The police officers had a different vantage point. They assert that, due to the confusing initial accounts provided by the initial on-scene interviews, they were still sorting out who may be criminal suspects as opposed to possibly innocent gunshot victims. (Tr. at 11). The Court notes, however, that at this point the officers had heard a witness describe occupants of Jones's vehicle as having pulled up alongside C.C. and Hunter during their walk and opened fire, fatally wounding Hunter. (Govt. Ex. 5, p. 7). That Jones was a victim remained a possibility, but could hardly have been the only possibility in the officers' minds, and does not appear to be the focus of the officers' interrogation of Jones.

Within two hours before the questioning, Jones was administered 50 mcg of Fentanyl, 2 mg of Hydromorphone (Dilaudid), and an additional 1 mg of Hydromorphone (Dilaudid). (Exhibit A, pg. SJ-00098, SJ-00145, and SJ-00147). Jones received both doses of Dilaudid within one hour of Detective Geiger's questioning. (Def. Ex. A, pg. SJ-00098 and SJ00145). Both drugs administered to Jones are capable of causing headaches, drowsiness, confusion, and a state of

euphoria that inhibits the patient's ability to appreciate the seriousness of his situation and thereby fail to make fully rational decisions.

A uniformed officer was posted outside Jones' examination room as a sentry to protect against any third parties who might wish to interfere with his treatment. (Tr. at 29-30, 62, 67-70, 72, 77). The specific purpose of the sentry was to provide security for a gunshot victim by preventing unauthorized third parties from gaining access to his room. (Tr. at 67). The assigned sentry was not tasked with preventing Jones from leaving his room or the medical facility. (Tr. at 72-73, 77). There was no evidence presented at either evidentiary hearing that establishes Jones was aware of this sentry's presence outside his room.

The interviewing officers assert that they did not administer any *Miranda* warnings to Jones because they always viewed him as a crime victim, and he was never considered to be in police custody. (Tr. at 14-17, 32, 35, 40-41, 73; Govt. Ex. 5). At all times during his interview, Jones appeared to the officers to be alert, conscious, coherent and not under the apparent influence of any drugs or alcohol. (Tr. at 13-14, 71-72). He indicated a willingness and ability to be interviewed. (Tr. at 14). The approximate 30-minute interview was audio recorded. (Tr. at 13, 16-17, 27, 31, 33- 35; Govt. Ex. 1). The questions posed to Jones were conversational as opposed to confrontational in tone. (Govt. Ex. 1).

Jones initially advised that both he and Grier were randomly shot while driving around area of the crime scene. (Id.). Under questioning, Jones' story changed when he admitted both he and Grier were in-fact attempting to sell marijuana when they were approached by two prospective customers whom he identified as Will and Osama. Jones claimed Will and Osama opened fire on them without warning in an apparent attempted robbery. (Id.).

Jones claimed he returned fire using a black .22 caliber semi-automatic handgun. (Id.). Jones thereafter indicated he discarded the handgun following the shooting, but later retracted this portion of the story admitting he in-fact stashed it at Grier's residence prior to being driven to the hospital. (Id.). Throughout Jones' interview, he was under the care, custody and control of the hospital staff. (Tr. at 73-74). Upon completion of the interview, the officers departed Emergency Room leaving him with the treating medical personnel. (Id.).

At no time during his interview did Jones ever indicate any unwillingness or inability to answer questions; request to speak with an attorney; a desire to terminate the interview; or a desire to depart Emergency Room 28. (Tr. at 14). At the conclusion of the interview, Jones remained free to depart the hospital, subject only to the advice and control of the treating medical personnel. (Tr. at 17, 74). Jones was never restrained, handcuffed, detained or arrested by police officials. (Tr. at 14-17, 22-23, 36- 37, 40-41, 76). He likewise was never placed in police custody, or criminally charged by state officials. (Id.). Throughout his interview, Jones was always free to depart the interview room (assuming he was physically able to do so). (Tr. at 14-15). Jones was ultimately discharged by hospital staff two days later following surgery on his left leg. (Def. Ex. A, p. 214, 291).

Following completion of Jones' interview, Dayton Police Department officers located Grier who was about to be released from the hospital. (Tr. at 12, 18, 41). Arrangements were made to transport Grier from the hospital to the Dayton Safety Building via a police cruiser for questioning. (Tr. at 18, 41). At that time, police officers likewise assert that they viewed Grier to be a crime victim. (Tr. at 41). Upon arriving at the Safety Building, Grier was placed in a controlled interview room. (Tr. at 18, 40; Govt. Ex. 2). This interview was audio/video recorded. (Tr. at 18:

5

Govt. Ex. 2). Detective Geiger and Sergeant Steele administered *Miranda* warnings to Grier because he had been placed in police custody. (Tr. at 18-20, 22-23, 41-42; Govt. Ex. 2B). Grier knowingly, voluntarily and intelligently waived his *Miranda* rights both orally and in writing. (Tr. at 19-20, 22, 43; Govt. Ex. 2, 2B).

At all times during his interview, Grier appeared alert, conscious, coherent and not under the apparent influence of any drugs or alcohol. (Tr. at 19). At no time during his interview did Grier indicate any desire to terminate the interview or speak with an attorney. (Tr. at 21). During his interview, Grier executed a written consent to search his mother's 821 Riverview Terrace residence where one or more firearms used in the incident were believed to be hidden. (Tr. at 20-21, 44-45; Govt. Ex. 2, 3B). Grier also executed a consent to search his Apple iPhone. (Govt. Ex. 4).

Police officials called Grier's mother and she provided a separate consent to search authority for the 821 Riverview Terrace residence. (Govt. Ex. 2). The officers assert that throughout the entire course of Grier's interview, they always considered Grier as a crime victim as opposed to a criminal suspect. (Tr. at 23, 41-42, 45). Admittedly, it is not absolutely unusual for evidence of crime to be found on a victim's iPhone or in their house, but one might think this would usually be when the crime occurred at the residence. Nevertheless, Grier was never arrested or criminally charged by state officials. (Tr. at 22). Following his interview, the police released him from Safety Building and drove him back to his mother's 821 Riverview Terrace residence. (Tr. at 22).

On January 16, 2020, Dayton Police Detective Michael T. Fuller, in his capacity as a Task Force Officer with the FBI's Dayton Safe Streets Task Force, swore out criminal complaints

against defendants Kalani Raimar Grier and Stephon Michael Jones. (See Case Nos. 3:20- mj-29 and 30 respectively). As a result, a magistrate judge issued arrest warrants against both defendants. On July 28, 2020, a single-count bill of information was filed against Grier alleging he brandished a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (See Case No. 3:20-cr-73, Doc. 26).

On September 22, 2020, a Grand Jury sitting in Dayton, Ohio returned a single-count indictment against Jones alleging he brandished a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (See Case No. 3:20-cr-102, Doc. 21). On April 13, 2020, a Grand Jury sitting in Dayton, Ohio returned a single-count superseding indictment against both defendants alleging they discharged a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. (See Case No. 3:20-cr-102, Doc. 44).

On April 20, 2021, Jones filed a motion to suppress. (Doc. 46). On April 26, 2021, Grier filed a companion motion to suppress. (Doc. 47). On June 2, 2021, this Court convened a joint evidentiary hearing to consider the merits of both defense motions. (Doc. 51). On June 16, 2021, a follow-up evidentiary hearing was held concerning Jones' suppression motion. (Doc. 53). On July 26, and August 2, 2021, Grier and Jones filed their respective post-hearing briefs. (Docs. 60 and 61). The Government has responded and a reply brief has been filed.

**Analysis**

The right to counsel and the privilege against self-incrimination guaranteed by the Fifth Amendment of the United States Constitution prohibits the use of a defendant's statement as evidence against him in the absence of a knowing, voluntary and intelligent waiver of those rights

as required by *Miranda v. Arizona* (1966), 384 U.S. 346. The procedural safeguards of *Miranda* apply whenever there is a custodial interrogation. *Miranda*, supra at 444. The prosecution may not use a defendant's statements, "whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Among these procedural safeguards, a defendant is entitled to "a warning as to the availability of the privilege against self-incrimination and to the assistance of counsel be issued prior to questioning whenever a suspect is (1) interrogated (2) while in custody." *Mason v. Brunsman*, 483 F. App'x 122, 126 (6th Cir. 2012) (internal citations omitted). Custodial interrogation occurs upon "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444.

Whether an individual is "in custody" is "determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. 652, 662 (2004). The test used to determine whether an individual is in custody or otherwise significantly deprived of freedom for purposes of *Miranda* depends on the circumstances of each case. *Berkemer v. McCarty* (1984), 468 U.S. 420. The "totality of the circumstances" requires consideration of several factors including, but not limited to: (1) whether the defendant felt free to leave, (2) the purpose of the questioning, (3) whether the place of the questioning was hostile or coercive, (4) the length of the questioning, and (5) other indicia of custody. *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000). An interview or line of questioning properly

characterized as "accusatory" will weigh in favor of finding that the defendant was in custody for the purposes of *Miranda*. *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019) (finding the accusatory nature of the questioning indicative of custody where the FBI agents called defendant's story "bullshit"); *Pollard v. Parris*, No. 3:20-00017, 2020 U.S. Dist. LEXIS 86821, at *57 (M.D. Tenn. May 18, 2020).

"Even brief questioning may necessitate *Miranda* warnings if the questioning takes place in a police-dominated or compelling atmosphere." *United States v. Harris*, 611 F.2d 170, 172 (6th Cir. 1979). Before a confession is admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 42 L. Ed. 568 (1897) (internal quotation and citation omitted); see also *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment"). An admission is deemed to be coerced where the conduct of law enforcement officials was such as to overbear the accused's will to resist, thus bringing about a confession not freely self-determined. *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961)).

The ultimate question in coerced confession cases is whether the confession was voluntary, or in other words, "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). In determining whether a statement by a suspect is voluntary, the Court must consider "'whether a

defendant's will was overborne by the circumstances surrounding the giving of a [statement].'" *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (quoting *Schneckloth*, 412 U.S. at 226). Courts must consider the totality of the circumstances in determining the voluntariness of coerced statements, including: (1) whether there was police coercion; (2) the length of the interrogation; (3) the location of the interrogation; (4) the continuity of the interrogation; (5) the suspect's maturity; (6) the suspect's education; (7) the suspect's physical condition and mental health; and, (8) whether the suspect was advised of his or her *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993).

A defendant may not be free to go in a hospital setting, but that does not create custody where the restraint on liberty is not created by the police. *United States v. New*, 491 F.3d 369 (8th Cir. 2007); *United States v. Jamison*, 509 F.3d 623 (4th Cir. 2007). Jones was not in police custody at the time of his interview. While Jones was sedated, he was conscious, alert, coherent and conversant throughout the interview. While he may have been in physical distress due to his gunshot wound, Jones was capable and willing to answer all police questions which were designed to explain how he ended up getting shot in his leg while inside a car.

Jones claimed to both the police and hospital personnel he was an innocent victim minding his own business when he ended up getting shot. (See Def. Ex. A, at 96). He was never restrained, detained, placed in police custody, arrested or charged by state officials. The hospital requested the posting of a sentry outside his room to keep unauthorized third parties from entering his room. Doc. 61-1, PageID 244. The sentry was never tasked with restricting Jones' movements in any way.

The practice of requesting a security sentry is consistent with hospital policy. Jones never requested that his interview be terminated, nor that he be allowed to speak with an attorney. At the conclusion of the interview the officers left, and as far as they were concerned, Jones was free to depart the hospital whenever he desired or was fit to do so. He was never arrested or criminally charged by state officials. He was repeatedly identified as a shooting victim (as opposed to a criminal suspect) in the Police Report of Investigation. (Govt. Ex. 5). Jones' interview conformed with the *Miranda* requirements. As a result, Jones' motion to suppress will be denied. See *Daniels v. Haws*, 2010 U.S. Dist. LEXIS 76254, *39, 2010 WL 2991216. (C.D. Ca. 2021) ("pre-arrest questioning in a hospital emergency room was merely investigative and not part of any custodial interrogation excludable under *Miranda*.")

Grier was not given the choice whether or not he was going to the station. (Tr. 41) Thus, it was a custodial interview and the officers *Mirandized* him. (Tr. 41). Still, Officer Geiger stated to the Court that he considered Grier a victim. (Tr. 18, 23).

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. To comport with the Constitution, searches must be pursuant to a warrant, which "shall issue [only] upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id. The Supreme Court has instructed that assessing the reasonableness of a warrantless search must begin with the basic rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (internal footnote omitted).

An individual's voluntary consent to a search is an exception to the warrant requirement of the Fourth Amendment. A valid search may be made without a warrant and without probable cause if the person voluntarily consents to the search. *Schneckloth v. Bustamante*, 412 U.S. 218, 219, 228–29 (1973); *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). Whether this exception applies is evaluated by examining the totality of the circumstances, with the burden resting on the Government to prove both actual consent and its voluntary nature. *United States v. Scott*, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The Government must make this showing through "clear and positive testimony" and to a preponderance of the evidence. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010); *United States v. Worley*, 193 F.3d 380, 385 (6th Cir. 1999). "Consent to a search must be voluntary and free of duress or coercion, express or implied." *United States v. Thomas*, 662 F. App'x 391, 395 (6th Cir. 2016); *Worley*, 193 F.3d at 386 (requiring that consent to search be "unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion").

In determining whether consent was voluntary, the Court considers the totality of the circumstances, including the "characteristics" of the consenting individual, such as (1) the individual's age, intelligence, and education level; (2) whether the individual understood she had the right to decline to consent; and (3) whether the individual understood her constitutional rights. *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998). The Court also considers the "details of the detention," such as (4) the nature and duration of the detention; (5) whether law enforcement used coercive or punitive conduct; and (6) any "indications of 'more subtle forms of coercion that might flaw [an individual's] judgement.'" Id. (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976)); see also *Worley*, 193 F.3d at 386.

Here, Grier was orally advised of his *Miranda* warnings. (Govt. Ex. 2A). Grier confirmed his waiver of his *Miranda* rights both orally and in writing by initialing and executing a standard waiver form. (Govt. Ex. 2B). His waiver of his *Miranda* rights was knowing, intelligent and voluntary. Grier was observed to be conscious, alert, coherent and conversant. He did not appear to be under the influence of any alcohol or drugs. Grier did not display slurred speech during the interview. The tone of the police questioning was not overly confrontational. The intended purpose of Grier's interview, just like Jones' was to try and unravel the facts surrounding the shooting. Grier never requested that the interview be terminated. He never requested to speak with an attorney. He voluntarily provided written consent to search the 821 Riverview Terrace residence and his phone. (Govt. Ex. 3B).

Grier was temporarily in police custody, but he was never arrested nor criminally charged by state officials.1 (Govt. Ex. 2). At the conclusion of the interview Grier was not released, driven home by law enforcement officials. Thus, Grier's interview conformed with the requirements of then Fifth Amendment and *Miranda*. Thus, Grier's motion to suppress will be denied.

**Conclusion**

Because Jones was not in custody and voluntarily engaged in an interview with the officers, Defendant's Motion to Suppress, Doc. 46, is **DENIED**. Because Grier was *Mirandized*, and voluntarily gave consent to searches, Defendant's Motion to suppress, Doc. 47, is **DENIED.**

**DONE** and **ORDERED** in Dayton, Ohio, this Wednesday, September 29, 2021.

---

1 Given the amount of evidence that the police possessed of a probable crime and the seriousness of the crime and the evidence tying Grier to it, the scope of his temporary detention for questioning was reasonable under *Terry*.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE