# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

**United States of America**

    *Plaintiff*,

**v.**                **Case No. 3:20-cr-102**
                  **Judge Thomas M. Rose**

**Stephon Michael Jones & Kalani Raimar Grier,**

    *Defendants*.

---

### ENTRY AND ORDER GRANTING PLAINTIFF'S MOTION *IN LIMINE*. (Doc. 68).

---

  Pending before the Court is the Government's Motion *in Limine*, doc. 68, which seeks to prevent the defense from mentioning, referencing, or arguing the applicability of a possible self-defense theory during any stage of the upcoming trial.

**Background**

  Between 8:00 - 8:30 PM on October 23, 2019, officers from the Dayton Police Department responded to a 911 call that reported a shooting near 1207 Windsor Ave. (Doc. 58, PageID 150, 152, 169; Tr. at 5, 7, 24). Upon arriving on scene, police officers observed a victim lying in the middle of the street in a pool of blood. (Tr. at 8; Govt. Ex. 5, p.7). The victim, who suffered a gunshot wound to his face was later identified as Stefon Hunter. (Tr. at 8, 25, 35; Govt. Ex. 5, p.

1

7- 9). Hunter was transported from the crime scene to the Miami Valley Hospital where he later expired. (Tr. at 11).

Police officers proceeded to interview three on-scene witnesses: "E.C.-G.", "E.P." and "C.C." (Tr. at 8, 24-25; Govt. Ex. 6). These witnesses provided conflicting, incomplete and otherwise confusing accounts of the shooting. (Govt. Ex. 5, p. 7, 9). "E.C.-G." was unable to provide any significant details about the incident because he purportedly was then too distraught to speak about the event. (Tr. at 8; Govt. Ex. 5, p. 7-8). "E.P." indicated she was a friend of Hunter, however, was not physically close enough to him when the shots went off to provide any details. (Tr. at 10-11). "C.C." advised that both he and Hunter had been walking down the street when an older tan model SUV pulled up alongside them and opened fire. (Govt. Ex. 5, p. 7). "C.C." provided no explanation as to why the vehicle occupants fired at them. (Id.).

The officers discovered a single spent .22 caliber shell casing and a single spent .380 shell casing near where Hunter's body was found. (Tr. at 8; Govt. Ex. 5, p. 10). A short time afterwards, dispatch advised on-scene officers that a tan GMC Envoy SUV matching the description provided by "C.C." had just arrived at the Grandview Hospital Emergency Room. (Tr. at 5, 9, 57, 59; Govt. Ex. 5, p.8). Officers and detectives traveled to the hospital to investigate. (Tr. at 9, 25).

The police learned four individuals occupied the subject vehicle when it arrived at the hospital. (Tr. at 9-10). The vehicle displayed a broken window and visible bullet holes. (Tr. at 5, 9, 57, 59; Govt. Ex. 5, p.8). Only two of the occupants, who later turned out to be Defendant Stephon Michael Jones and Kalani Raimar Grier, had suffered gunshot wounds. (Tr. at 5, 10-11). Jones had a gunshot wound that shattered his left femur, while Grier suffered a superficial graze wound across his chest. (Tr. at 12, 19, 30-31, 43; Def. Ex. A).

2

In hopes of learning more about the shooting, Police Department Homicide Detective William Geiger and Sergeant Walt Steele from the Montgomery County Sheriff's Office decided to interview Jones, who was then located in Emergency Room 28. (Tr. at 10-12, 25-27, 32, 64-65, 67; Def. Ex. A, p. 287). Upon their arrival at the hospital, they observed the SUV with bullet holes.

When Jones was admitted to the hospital, Dr. Stephen Paul determined, "Due to the circumstances surrounding his trauma, we will make him Do Not Announce. He should have an officer with him at all times." Doc. 61-1, PageID 244. The police officers had a different vantage point. They assert that, due to the confusing initial accounts provided by the initial on-scene interviews, they were still sorting out who may be criminal suspects as opposed to possibly innocent gunshot victims. (Tr. at 11). The Court notes, however, that at this point the officers had heard a witness describe occupants of Jones's vehicle as having pulled up alongside C.C. and Hunter during their walk and opened fire, fatally wounding Hunter. (Govt. Ex. 5, p. 7). That Jones was a victim remained a possibility, but could hardly have been the only possibility in the officers' minds.

Within two hours before the questioning, Jones was administered 50 mcg of Fentanyl, 2 mg of Hydromorphone (Dilaudid), and an additional 1 mg of Hydromorphone (Dilaudid). (Exhibit A, pg. SJ-00098, SJ-00145, and SJ-00147). Jones received both doses of Dilaudid within one hour of Detective Geiger's questioning. (Def. Ex. A, pg. SJ-00098 and SJ00145). Both drugs administered to Jones are capable of causing headaches, drowsiness, confusion, and a state of euphoria that inhibits the patient's ability to appreciate the seriousness of his situation and thereby fail to make fully rational decisions.

3

A uniformed officer was posted outside Jones' examination room as a sentry to protect against any third parties who might wish to interfere with his treatment. (Tr. at 29-30, 62, 67-70, 72, 77). The specific purpose of the sentry was to provide security for a gunshot victim by preventing unauthorized third parties from gaining access to his room. (Tr. at 67). The assigned sentry was not tasked with preventing Jones from leaving his room or the medical facility. (Tr. at 72-73, 77). There was no evidence presented at either evidentiary hearing that establishes Jones was aware of this sentry's presence outside his room.

The interviewing officers assert that they did not administer *Miranda* warnings to Jones because they always viewed him as a crime victim, and he was never considered to be in police custody. (Tr. at 14-17, 32, 35, 40-41, 73; Govt. Ex. 5). At all times during his interview, Jones appeared to the officers to be alert, conscious, coherent and not under the apparent influence of any drugs or alcohol. (Tr. at 13-14, 71-72). He indicated a willingness and ability to be interviewed. (Tr. at 14). The approximate 30-minute interview was audio recorded. (Tr. at 13, 16-17, 27, 31, 33- 35; Govt. Ex. 1). The questions posed to Jones were conversational as opposed to confrontational in tone. (Govt. Ex. 1).

Jones initially advised that both he and Grier were randomly shot while driving around area of the crime scene. (Id.). Under questioning, Jones' story changed when he admitted both he and Grier were in-fact attempting to sell marijuana when they were approached by two prospective customers whom he identified as Will and Osama. Jones claimed Will and Osama opened fire on them without warning in an apparent attempted robbery. (Id.).

Jones claimed he returned fire using a black .22 caliber semi-automatic handgun. (Id.). Jones thereafter indicated he discarded the handgun following the shooting, but later retracted this

4

portion of the story admitting he in-fact stashed it at Grier's residence prior to being driven to the hospital. (Id.). Throughout Jones' interview, he was under the care, custody and control of the hospital staff. (Tr. at 73-74). Upon completion of the interview, the officers departed Emergency Room leaving him with the treating medical personnel. (Id.).

At no time during his interview did Jones ever indicate any unwillingness or inability to answer questions; request to speak with an attorney; a desire to terminate the interview; or a desire to depart Emergency Room 28. (Tr. at 14). At the conclusion of the interview, Jones remained free to depart the hospital, subject only to the advice and control of the treating medical personnel. (Tr. at 17, 74). Jones was never restrained, handcuffed, detained or arrested by police officials. (Tr. at 14-17, 22-23, 36- 37, 40-41, 76). He likewise was never placed in police custody, or criminally charged by state officials. (Id.). Throughout his interview, Jones was always free to depart the interview room (assuming he was physically able to do so). (Tr. at 14-15). Jones was ultimately discharged by hospital staff two days later following surgery on his left leg. (Def. Ex. A, p. 214, 291).

Following completion of Jones' interview, Dayton Police Department officers located Grier who was about to be released from the hospital. (Tr. at 12, 18, 41). Arrangements were made to transport Grier from the hospital to the Dayton Safety Building via a police cruiser for questioning. (Tr. at 18, 41). At that time, police officers likewise assert that they viewed Grier to be a crime victim. (Tr. at 41). Upon arriving at the Safety Building, Grier was placed in a controlled interview room. (Tr. at 18, 40; Govt. Ex. 2). This interview was audio/video recorded. (Tr. at 18: Govt. Ex. 2). Detective Geiger and Sergeant Steele administered *Miranda* warnings to Grier because he had been placed in police custody. (Tr. at 18-20, 22-23, 41-42; Govt. Ex. 2B). Grier

5

knowingly, voluntarily and intelligently waived his *Miranda* rights both orally and in writing. (Tr. at 19-20, 22, 43; Govt. Ex. 2, 2B).

At all times during his interview, Grier appeared alert, conscious, coherent and not under the apparent influence of any drugs or alcohol. (Tr. at 19). At no time during his interview did Grier indicate any desire to terminate the interview or speak with an attorney. (Tr. at 21). During his interview, Grier executed a written consent to search his mother's 821 Riverview Terrace residence where one or more firearms used in the incident were believed to be hidden. (Tr. at 20-21, 44-45; Govt. Ex. 2, 3B). Grier also executed a consent to search his Apple iPhone. (Govt. Ex. 4).

Police officials called Grier's mother and she provided a separate consent to search authority for the 821 Riverview Terrace residence. (Govt. Ex. 2). The officers assert that throughout the entire course of Grier's interview, they always considered Grier as a crime victim as opposed to a criminal suspect. (Tr. at 23, 41-42, 45). Admittedly, it is not absolutely unusual for evidence of crime to be found on a victim's iPhone or in their house, but one might think this would usually be when the crime occurred at the residence. Nevertheless, Grier was never arrested or criminally charged by state officials. (Tr. at 22). Following his interview, the police released him from Safety Building and drove him back to his mother's 821 Riverview Terrace residence. (Tr. at 22).

On January 16, 2020, Dayton Police Detective Michael T. Fuller, in his capacity as a Task Force Officer with the FBI's Dayton Safe Streets Task Force, swore out criminal complaints against defendants Kalani Raimar Grier and Stephon Michael Jones. (See Case Nos. 3:20- mj-29 and 30 respectively). As a result, a magistrate judge issued arrest warrants against both defendants.

On July 28, 2020, a single-count bill of information was filed against Grier alleging he brandished a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (See Case No. 3:20-cr-73, Doc. 26).

On September 22, 2020, a Grand Jury sitting in Dayton, Ohio returned a single-count indictment against Jones alleging he brandished a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2. (See Case No. 3:20-cr-102, Doc. 21). On April 13, 2020, a Grand Jury sitting in Dayton, Ohio returned a single-count superseding indictment against both defendants alleging they discharged a loaded firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. (See Case No. 3:20-cr-102, Doc. 44).

**Analysis**

A motion *in Limine* is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds. See *Randle v. Tregre*, 147 Supp. 3d 581,595-96 (E.D. La 2015), citing *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 n.1 (5th Cir. 1977). "[M]otions *in limine* may be used to secure a pretrial ruling that certain evidence is admissible or inadmissible." *Bond Pharmacy, Inc. v. AnazaoHealth Corp.*, No. 3:11-cv-058, 2012 WL 3052902, at *2 (S.D. Miss. July 25, 2012)(citing cases). Here, the Government anticipates that the defense may attempt to assert the applicability of a self-defense theory. The Government contends that under the proffered facts of this case, such a tact would be inappropriate.

7

The Sixth Circuit has held that self-defense is irrelevant to a § 924(c) violation. See *United States v. Poindexter*, et al., 942 F.2d 354, 360 (1991). A defendant's alleged reasons for being armed, such as for self-protection, does not constitute a legal defense under § 924(c). See *Morris v. United States*, 14 Fed. App'x 345, **2 (6th Cir. 2001). However, the law in this area is far from stagnant:

> In *District of Columbia v. Heller*, the Supreme Court interpreted [the second amendment] to "guarantee [an] individual right to possess and carry weapons in case of confrontation." 554 U.S. 570 (2008). The *Heller* Court held that the District of Columbia's ban on handgun possession in the home by law-abiding citizens violated the Second Amendment. Id. at 2821. The Court reasoned that "the inherent right of self-defense has been central to the Second Amendment right" and that "[t]he handgun ban amount[ed] to a prohibition of an entire class of 'arms' ... overwhelmingly chosen by American society for that lawful purpose." Id. at 2817. The Court qualified the right to bear arms: "[l]ike most rights, [it] is not unlimited." Id. at 2816. "[N]othing in [*Heller* ] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings...." Id. at 2816–17.
>
> After *Heller*, [the Eleventh Circuit] held that § 922(g)(1) is a "constitutional avenue to restrict the Second Amendment right of" convicted felons. *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir.), petition for cert. filed, (U.S. Apr. 30, 2010) (No. 09–10590). Since *Heller* expressly disclaimed any erosion of the "longstanding prohibitions on the possession of firearms by felons," [*Rozier*] held that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." Id. However, …the Supreme Court [has not] addressed whether § 924(c) violates the Second Amendment.

*United States v. Feaster*, 394 F. App'x 561, 564–65 (11th Cir. 2010).

Defendant's position is that the gun involved in the incident at issue was present coincidentally, and not for purposes connected to drug trafficking or self-protection in relationship

to that offense. The Court does not believe *Heller* has changed the availability of a self-defense defense to a § 924(c) charge. However, should Defendant proffer an evidentiary basis that he never "carried" the firearm prior to the moment that necessitated self-defense, the Court will entertain argument on the question. See *Currier v. United States*, 320 F.3d 52, 57 (1st Cir. 2003) (recognizing that "at least in theory" there may be circumstances in which a "necessity" defense may be interposed in a 924(c) prosecution); *United States v. Lyttle*, No. 9:15-CR-00121-DCN, 2017 U.S. Dist. LEXIS 16776, 2017 WL 492201, at *4 (D.S.C. Feb. 7, 2017) (stating that "it is difficult to conceive of how one might be forced to use or possess a firearm in relation to or in furtherance of a drug trafficking crime," but noting "perhaps these conditions can be met under some circumstances").

**Conclusion**

Because the Sixth Circuit has held that self-defense is irrelevant to a § 924(c) violation, the Government's Motion *in Limine*, doc. 68, is **GRANTED.** Defendants may not mention, reference, or argue the applicability of a self-defense theory during any stage of the upcoming trial.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, February 14, 2022.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE